



# FELONY

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

## INDICTMENT FOR CONSPIRACY TO COMMIT MAIL AND WIRE FRAUD, WIRE FRAUD, MAIL FRAUD, CONSPIRACY TO USE A FACILITY IN INTERSTATE COMMERCE IN AID OF BRIBERY, USE OF A FACILITY IN INTERSTATE COMMERCE IN AID OF BRIBERY, AND FALSE STATEMENT

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIMINAL NO.** |
| | | **24-00155** |
| **v.** | * | **SECTION:** |
| | | **SECT. R MAG. 2** |
| **CHRISTIAN CONRAD CLAUS** | * | **VIOLATIONS: 18 U.S.C. § 371** |
| | | 18 U.S.C. § 1001(a)(2) |
| | * | 18 U.S.C. § 1341 |
| | | 18 U.S.C. § 1343 |
| | * | 18 U.S.C. § 1349 |
| | | 18 U.S.C. § 1952(a)(3) |
| * | * | * |

The Grand Jury charges that:

## COUNT 1
### (Conspiracy to Commit Mail and Wire Fraud)

### A.   AT ALL TIMES MATERIAL HEREIN:

#### *Defendant Christian Conrad Claus*

1.   Defendant **CHRISTIAN CONRAD CLAUS ("CLAUS")** was employed as a police officer by the New Orleans Police Department ("NOPD").

Fee ___U.S.A.___
Process_____
X Dktd_____
___ CtRmDep_____
___ Doc.No._____

2.     As an NOPD police officer, **CLAUS's** lawful and official duties included, among others:

a.  Duties regarding writing police reports, including a duty to not suppress, conceal, or distort the facts of any reported incident and a duty to not make an intentionally false, inaccurate, or incomplete report.

b.  Duties regarding his communications related to the scope of his NOPD employment and NOPD operations, including the duties to be honest and truthful, to truthfully state the facts, to not make any false, misleading, or incorrect statement, and to not withhold relevant information.

c.  A duty to not recommend or suggest in any manner, except in the transaction of personal business, the employment or procurement of a particular professional service.

d.  A duty to use NOPD property only for the purpose for which it is intended and in accordance with the NOPD's policies, rules, procedures, and orders.

e.  A duty to refrain from initiating, developing, or maintaining financial relationships with victims or witnesses during, or as a direct result of, any official contact until such time as the investigation has reached a final resolution in the criminal justice system.

f.  A duty to take no action in a matter normally within the scope of his duties to which he is an interested or involved party.

g.  A duty to not solicit from any person any gift, money, or property if it is reasonable to infer the person seeks to influence action of an official nature or seeks to affect the performance or non-performance of an official duty, or has

an interest which may be substantially affected directly or indirectly by the performance or non-performance of an official duty.

    h. A duty to not use his NOPD position for personal or financial gain.

3.    **CLAUS** was also an attorney and was experienced in criminal law matters, having previously worked as a prosecutor and as a criminal defense attorney in private practice. **CLAUS** was also experienced in art-related matters, including the buying and selling of art and litigation related to art.

4.    **CLAUS** was friends with Michael Jon Schofield ("Schofield"), a Nevada resident who conducted art-related business, including creating paintings and buying and selling art.

### *Claus's October 25, 2019, response to Fouad K. Zeton's house*

5.    Fouad K. Zeton ("Zeton") owned and resided in a house in New Orleans, Louisiana. Zeton also owned a hotel and a restaurant in New Orleans, Louisiana. Zeton held a homeowners insurance policy with an insurance company, Company-A. The insurance policy covered, among other things, loss by theft of Zeton's personal property.

6.    On or about the afternoon of October 25, 2019, Zeton made an insurance claim that property had been stolen from his house.

7.    On or about the night of October 25, 2019, Zeton called 911 and reported that his house had been burglarized. **CLAUS**, in his capacity as an NOPD police officer, reported to Zeton's house in response to Zeton's 911 call.

8.    Zeton told **CLAUS** that the burglary occurred approximately two days earlier. **CLAUS** asked Zeton why he waited to report the burglary, and Zeton responded that he had been looking for the missing property during the intervening time.

9.      Zeton reported to **CLAUS** that, as a result of the burglary, he was missing jewelry, cash, and a leather jacket. **CLAUS** asked Zeton if anything else was missing. Zeton confirmed nothing else was missing.

10.     After further conversation, **CLAUS** asked Zeton to restate the missing items while **CLAUS** took notes. Zeton again reported that the missing property consisted only of jewelry, cash, and a leather jacket.

11.     In discussing who had access to his house, Zeton explained that although there had been construction work at the house, work in the interior of the house had already been completed.

12.     While discussing the missing jewelry, **CLAUS** asked, "Do you have an insurance policy here right now?" Zeton informed **CLAUS** that he had an insurance policy.

13.     **CLAUS** told Zeton about how the value of missing items is determined. **CLAUS** said, "I used to do this." **CLAUS** explained that insurers can use the proven value of items instead of the purchase price. **CLAUS** offered as an example a sword he purchased for $50 that was later stolen. **CLAUS** explained that the seller "wrote a letter saying how much it was worth; he said five thousand dollars; and he proved that that was worth five thousand."

14.     Although Zeton made no reference to art being stolen, **CLAUS** informed Zeton that the same valuation principles apply to art. **CLAUS** stated in substance, "I had the same thing with art," "you buy the art," and "it's worth what it's appraised."

15.     **CLAUS** represented to Zeton that **CLAUS** was experienced in art dealings, was an experienced attorney, and needed money due to a significant change in his financial circumstances. **CLAUS** said in substance:

    a.   "I was in Las Vegas. I was working as an attorney doing art and trial work and that sort of thing and I made some pretty good money."

    b.   "Understand, I was an attorney and I did a lot of work with art, like paintings."

4

    c.  "I still do some work with paintings with clients."

    d.  "My good friend—he's a very good friend—and right now he and I are selling—I'm helping him sell, his attorney, helping him sell a—well, he's got a Picasso that he's trying to sell and then he's got a Klimt, which is another famous artist."

    e.  "I started out as a district attorney and I made a lot more money doing defense work and other stuff."

    f.  "My last year in Las Vegas, which was not different from any others, it was four hundred and forty-six thousand dollars is what I paid taxes on."

    g.  "But for the last five, things have been tough."

    h.  "There's not enough for retirement."

    i.  "I put away a decent amount of money, but now it's all gone."

    j.  "I can make more. I never had much trouble making money."

16.    **CLAUS** informed Zeton that **CLAUS** had usually gone by the name "Conrad," but now goes by "Chris" in his capacity as a police officer. **CLAUS** explained that "Conrad" was his "attorney name" and that he had been on television as an attorney. **CLAUS** told Zeton, "I don't want people to know that down here, so I use my first name, Chris."

17.    At no time during their October 25, 2019, interaction did Zeton report that paintings or mirrors were missing.

18.    On or about October 26, 2019, **CLAUS** created and submitted for supervisory approval a police report about his response to Zeton's house. The report indicated, among other things, the following:

    a.  The stolen property consisted of jewelry, cash, and a leather jacket.

b. Other than the theft of these items from Zeton's upstairs bedroom, "nothing else upstairs was disturbed."

c. "Nothing additional was disturbed in the downstairs areas of the home."

d. "Construction work was done and no workers had access."

## B.   THE CONSPIRACY:

Beginning in or about October 2019 and continuing to in or about June 2021, in the Eastern District of Louisiana and elsewhere, defendant **CHRISTIAN CONRAD CLAUS**, Fouad K. Zeton, and Michael Jon Schofield did knowingly and willfully combine, conspire, confederate, and agree with each other to devise, intend to devise, and participate in a scheme to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, and to, for the purpose of executing said scheme: (a) cause any matter and thing to be delivered by mail and by a private and commercial interstate carrier in violation of Title 18, United States Code, Section 1341; and (b) transmit and cause to be transmitted by means of wire communication, in interstate commerce, any writings, signs, signals, pictures, and sounds, in violation of Title 18, United States Code, Section 1343.

## C.   MANNER AND MEANS:

Among the manner and means by which **CLAUS**, Zeton, and Schofield carried out the conspiracy included the following:

1.     On or about October 27, 2019, **CLAUS** and Zeton had phone contacts, including calls totaling approximately 30 minutes and Zeton texting **CLAUS** photographs of paintings.

2.     On or about October 28, 2019, **CLAUS** and Zeton had a meeting, after which **CLAUS** texted Zeton, "I will swing by tomorrow to get the information."

3.     On or about October 29, 2019, **CLAUS** and Zeton had phone contacts including text messages about meeting the next day.

4.      On or about October 30, 2019, **CLAUS** and Zeton met at Zeton's restaurant in the French Quarter and at Zeton's residence.

5.      On or about October 31, 2019, **CLAUS** texted Zeton, "If the stolen paintings are of similar quality to the one i photoed Michael believes he can fairly estimate the value the stolen paintings at over 100,000. Please get me the information tomorrow as early as possible so I can pass it on." That day, **CLAUS** also texted Zeton, "let me know when you can receive a phone call and I will talk to about what I'm hearing from Michael and we'll share some thoughts with you before you talk to [an NOPD detective's first name]." "Michael" in these text messages referred to Schofield. Despite referring to "stolen paintings" in the text message, **CLAUS** knew that paintings had not been stolen from Zeton's house.

6.      On or about November 1, 2019, **CLAUS** involved unwitting members of the NOPD in the scheme.

7.      On or about November 1, 2019, **CLAUS** and Zeton met before Zeton called the NOPD's non-emergency phone number. Zeton told the operator that he needed an officer to come to his house so that he could report his discovery that paintings were missing.

8.      On or about November 1, 2019, an NOPD police officer, who was unaware of the scheme, responded to Zeton's call and met Zeton at his residence. Zeton falsely told the officer that Zeton had discovered that valuable paintings were missing from his house. Zeton provided only general information about the paintings and said he would later provide the NOPD with more detailed information.

9.      After the responding officer left Zeton's house, **CLAUS** used a City of New Orleans computer system to view information about the responding officer's report. Later that night, **CLAUS** met again with Zeton.

10.     On or about November 2 and 3, 2019, **CLAUS** and Zeton had multiple phone contacts.

11.     On or about the night of November 3, going into early November 4, 2019, **CLAUS** had a meeting with Zeton at Zeton's house, during which Zeton texted **CLAUS** photographs of approximately ten paintings. These paintings would later appear in an appraisal that was created by Schofield and submitted to Company-A.

12.     On or about November 4, 2019, **CLAUS** coordinated an approximately 32-minute phone call between himself, Zeton, and Schofield, after which **CLAUS** had individual calls with Zeton and then Schofield.

13.     On or about the night of November 5, going into early November 6, 2019, **CLAUS** met with Zeton.

14.     On or about November 6, 2019, Schofield, acting at **CLAUS's** direction, sent **CLAUS**, via interstate email, a document containing descriptions and purported retail values of 12 paintings. The purported retail values intentionally overstated the paintings' actual values and Schofield's opinion about the paintings' values. The document included the text shown in bold below:

|  | **Value** |
|---|---|
| **1..The Ball at the Colonels House 36x48 oil on canvas signed** | **10,000** |
| **2..The Peacock oil on canvas signed and framed 30x40** | **15,000** |
| **3..Old Guard oil on canvas signed and framed 30x40** | **15,000** |
| **4..Feding Time oil on canvas signed framed 24x30** | **10,000** |
| **5..Dutch Masters oil on canvas signed framed 24x30** | **8,000** |
| **6..Heart Break oil on canvas signed framed 24x30** | **8,000** |
| **7..Royality oil on canvas signed 36x48** | **10,000** |

| | |
|---|---|
| **8..Revolution at Hand oil on canvas signed 48x72** | **15,000** |
| **9..The Courtship oil on canvas signed 48x72** | **15,000** |
| **10..Mona Lisa oil on canvas signed 16x20 framed** | **2,500** |
| **11..The Garden Part oil on canvas signed 36x48 framed** | **10,000** |
| **12..The Garden Party II oil on canvas signed 36x48** | **10,000** |

15.     After Schofield emailed the above-referenced document to **CLAUS**, **CLAUS** took the above text from Schofield's document and copied it into a text message. **CLAUS** then sent the text message to Zeton, thereby providing Zeton with descriptions and purported values of 12 paintings.

16.     Later, on or about November 6, 2019, Zeton called **CLAUS**. Approximately one minute later, Zeton called 911 and requested that an officer respond to his house. Zeton told the 911 operator that he needed to supplement his burglary report with additional missing property. Zeton tried to sound as if he was not particularly familiar with the officer who took the initial burglary report, telling the 911 operator that the officer's name was "Mister Conrad, I believe. Chris Conrad, something like that."

17.     On or about November 6, 2019, shortly after Zeton's 911 call, **CLAUS**, while on NOPD duty, announced over his NOPD radio that he would respond to the call at Zeton's house. **CLAUS** reported to Zeton's house and activated the recording feature of an NOPD body-worn video camera, and  commenced an approximately 33-minute staged encounter that included the following:

> a. **CLAUS** knocked on Zeton's front door and, when Zeton did not answer, **CLAUS** pretended that he had no way to reach Zeton and requested over his police radio that Zeton be telephoned.

9

    b.  After Zeton answered the door, he and **CLAUS** pretended to have not been in frequent contact with each other since their initial meeting. This included:

        i.  **CLAUS** and Zeton repeatedly addressing each other as "sir," even though by this point, Zeton had taken to calling **CLAUS** "friend" and "brother" in their private communications.

        ii.  **CLAUS** stating, in substance, "Please stop calling me 'sir.' You're making me nervous. I work for you, sir, not the other way around."

        iii.  **CLAUS** stating, "You seem like a very nice man."

    c.  To conceal their frequent contacts and meetings, **CLAUS** and Zeton pretended to have difficulty recalling when **CLAUS** initially responded to Zeton's residence. This included **CLAUS** stating in substance:

        i.  "I certainly recognized your address and I recognize you. But it's been at least a week."

        ii.  "I think it was in November, so it couldn't have been more than three or four days ago. Maybe. I don't know."

        iii.  "Maybe two weeks."

        iv.  "I very clearly remember being here last time."

        v.  "I remembered you. I wanted to come back because we had a good conversation."

    d.  **CLAUS** wrote and passed a note to Zeton to influence Zeton's statements to be captured by the body camera. **CLAUS** wrote "NOT CONRAD" on a piece of paper and then showed it to Zeton. **CLAUS** did this because Zeton had just referred to **CLAUS** as "Officer Conrad" despite **CLAUS** previously telling

Zeton that **CLAUS** is known as "Chris" and is not known as "Conrad" in his capacity as a police officer.

e.  To make it seem that their interactions were not planned, **CLAUS** asked, "what did you discover?" to which Zeton replied that he had a list. As they both knew, the "list" was actually the information from Schofield that **CLAUS** had texted Zeton earlier that day.

f.  Zeton handed **CLAUS** Zeton's cell phone, which displayed **CLAUS's** text message. **CLAUS** took notes and read aloud from the text message to make it appear that he was obtaining new information rather than reading a message he sent Zeton earlier that day.

g.  **CLAUS** asked if any other property was missing. Zeton said two mirrors were also missing.

h.  **CLAUS** asked Zeton, "Did I misunderstand you when you said that there was no more construction?" **CLAUS** asked this because he was concerned that his initial police report said, "Construction work was done and no workers had access." **CLAUS** knew that the theft of paintings and mirrors would be more believable if construction workers had access to the interior of Zeton's house. Zeton replied, "Yes sir, misunderstood." **CLAUS** then suggested that the workers may have been involved in the theft of the paintings.

18.   On or about November 6, 2019, **CLAUS** used the internet to upload and submit to the NOPD the November 6 body camera recording.

19.   On or about November 6, 2019, **CLAUS** created a police report indicating that Zeton reported the theft of paintings with a combined value of $128,500 and two mirrors with a combined value of $5,000. The police report indicated that Zeton "provided detailed information"

about the stolen property and that "[t]he matter was recorded on body worn camera." The police report's descriptions of the paintings reflected the information contained in the text message **CLAUS** had sent Zeton, including the false values. The police report also stated, among other things, that Zeton indicated construction work was still ongoing, that "officer Claus' impression of their earlier conversation about all work being done was not accurate," and that the workers had "unrestricted access to the home while Mr. Zeton was not present and they were working." **CLAUS** also concealed and omitted from the police report, among other things, the following:

      a. **CLAUS's** true interactions, relationships, and communications with Zeton and Schofield.

      b. That **CLAUS** and Zeton had numerous meetings and discussions about a plan for Zeton to report stolen paintings;

      c. That **CLAUS** and Zeton planned and staged Zeton's November 6, 2019, reporting of information to **CLAUS**.

      d. That earlier that day, before Zeton called 911, **CLAUS** received a list of descriptions of the purportedly stolen paintings from Schofield.

      e. That earlier that day, before Zeton called 911, **CLAUS** texted Zeton the list of paintings.

      f. That the "detailed information" Zeton provided about the paintings was actually the text message **CLAUS** sent Zeton.

20.     On or about November 6, 2019, **CLAUS** submitted for supervisory approval the above-referenced police report regarding his November 6, 2019, response to Zeton's house and thereby caused an NOPD Sergeant to approve the police report. The NOPD Sergeant was unaware of the scheme.

21. On or about November 22, 2019, Zeton caused an associate to send, via interstate email, three police reports to a claims adjuster retained by Company-A. The police reports were **CLAUS**'s reports of his October 25, and November 6, 2019, responses to Zeton's house, and the report of the police officer who responded to Zeton's house on November 1, 2019.

22. On or about November 22, 2019, Zeton caused an associate to send, via interstate email, photographs of purportedly stolen paintings to the claims adjuster.

23. By on or about December 4, 2019, Schofield had created an appraisal that included, among other information, the same descriptions and purported retail values of 12 paintings that Schofield had emailed to **CLAUS** on November 6, 2019. The appraisal overstated the paintings' true retail values and misrepresented Schofield's true evaluation and opinions of the paintings.

24. On or about December 5, 2019, **CLAUS** sent to Schofield in Las Vegas, Nevada, via a private and commercial interstate carrier, a $2,000 check payable to Schofield and drawn on **CLAUS's** bank account as payment for the appraisal.

25. On or about December 6, 2019, Schofield received and cashed the $2,000 check. Later that day, **CLAUS** texted Zeton photographs of Schofield's appraisal.

26. On or about December 7, 2019, a hardcopy of the appraisal, sent via the U.S. Postal Service by Schofield to Zeton, arrived in the Eastern District of Louisiana. That day, **CLAUS** sent the following text message to Zeton: "The package is out for delivery with the post office. It's on a truck right now making deliveries. Somebody should be at your house to take delivery if possible."

27. On or about December 8, 2019, Schofield sent an interstate email to **CLAUS** with the subject line "Appraisal" and an attached document named "Michael J.docx appraisal for Conrad.and Mr F Zelton.docx." Schofield then sent another interstate email to **CLAUS** with the

13

subject line "appraisal" and attached documents named "Michael J.docx appraisal for Conrad.docx 2.docx" and "Michael J.docx appraisal for Conrad.and Mr F Zelton.docx."

28.     On or about December 10, 2019, Zeton caused an associate to send, via interstate email, Schofield's appraisal to the claims adjuster. The claims adjuster responded by texting Zeton questions, which Zeton copied and texted to **CLAUS**.

29.     On or about December 11, 2019, Zeton caused an associate to send the claims adjuster, via interstate email, false representations in answer to the questions.

30.     On or about July 30, 2020, Company-A's representative questioned Zeton about the insurance claim. The representative asked Zeton to identify the person who had referred him to Schofield and to explain how Zeton paid Schofield. Zeton falsely stated that he could not recall who had told him to use Schofield as the appraiser and that he could not recall how Schofield had been paid. Zeton concealed that **CLAUS** had arranged for Schofield to appraise the paintings and that **CLAUS** had paid Schofield.

31.     In June 2021, Zeton's insurance claim was still pending and **CLAUS** continued to conceal from the NOPD his true role in Zeton's reports of stolen property and insurance claim.

All in violation of Title 18, United States Code, Section 1349.

## COUNT 2
### (Wire Fraud)

**A.     AT ALL TIMES MATERIAL HEREIN:**

The allegations contained in Section A of Count 1 are re-alleged and incorporated as if fully set forth herein.

**B.     THE SCHEME:**

From in or about October 2019, to in or about June 2021, in the Eastern District of Louisiana and elsewhere, defendant **CHRISTIAN CONRAD CLAUS** knowingly devised,

intended to devise, and participated in a scheme to defraud Company A and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises.

## C.   MANNER AND MEANS:

The numbered allegations contained in Section C of Count 1 are re-alleged and incorporated as if fully set forth herein and were among the manner and means by which the scheme was carried out.

## D.   THE WIRE:

On or about November 22, 2019, in the Eastern District of Louisiana and elsewhere, defendant **CHRISTIAN CONRAD CLAUS ("CLAUS")**, for the purpose of executing the scheme described above, and attempting to do so, transmitted and caused to be transmitted by means of wire communication in interstate commerce writings, signs, and signals, to wit: an email, including an attached file containing three police reports, in support of Zeton's insurance claim, from the Eastern District of Louisiana to outside Louisiana from Zeton's associate to a claims adjuster retained by Company-A.

All in violation of Title 18, United States Code, Section 1343.

### COUNT 3
### (Mail Fraud)

## A.   AT ALL TIMES MATERIAL HEREIN:

The allegations contained in Section A of Count 1 are re-alleged and incorporated as if fully set forth herein.

## B.   THE SCHEME:

The allegations contained in Section B of Count 2 are re-alleged and incorporated as if fully set forth herein.

## C.    MANNER AND MEANS:

The numbered allegations contained in Section C of Count 1 are re-alleged and incorporated as if fully set forth herein and were among the manner and means by which the scheme was carried out.

## D.    THE MAILING:

On or about December 5, 2019, in the Eastern District of Louisiana, for the purpose of executing the scheme described above, and attempting to do so, defendant **CHRISTIAN CONRAD CLAUS** knowingly deposited and caused to be deposited to be sent and delivered by a private and commercial interstate carrier an envelope containing a check payable to Schofield in the amount of $2,000.

All in violation of Title 18, United States Code, Section 1341.

### COUNT 4
### (Conspiracy to Use a Facility in Interstate Commerce in Aid of Bribery)

## A.    AT ALL TIMES MATERIAL HEREIN:

The allegations contained in Sections A and C of Count 1 are re-alleged and incorporated as if fully set forth herein.

## B.    THE CONSPIRACY:

Beginning in or about October 2019 and continuing until a date unknown, in the Eastern District of Louisiana and elsewhere, defendant **CHRISTIAN CONRAD CLAUS** and Fouad K. Zeton willfully and knowingly did combine, conspire, confederate, and agree to use the mail and facilities in interstate commerce with the intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment and carrying on of an unlawful activity, that is, bribery in violation of Louisiana Revised Statute 14:118, and to thereafter perform an act to promote, manage, establish, and carry on, and to facilitate the promotion, management,

establishment, and carrying on of such unlawful activity, in violation of Title 18, United States Code, Section 1952(a)(3).

## C.   MANNER AND MEANS:

Among the manner and means by which **CLAUS** and Zeton carried out the conspiracy included the following:

1.     **CLAUS** offered to accept from Zeton, and Zeton offered to give to **CLAUS**, a thing of value with the intent to influence **CLAUS's** conduct in relation to **CLAUS's** NOPD position, employment, and duty.

2.     A thing of value that **CLAUS** offered to accept under such circumstances included a portion of the anticipated payment from Zeton's insurance claim.

3.     A thing of value that **CLAUS** offered to accept under such circumstances included assistance in obtaining employment positions.

4.     **CLAUS's** conduct to be influenced under such circumstances included official acts.

5.     **CLAUS's** conduct to be influenced under such circumstances included violations of lawful and official NOPD duties.

6.     **CLAUS's** conduct to be influenced under such circumstances included his suppression, concealment, and distortion of facts.

7.     **CLAUS's** conduct to be influenced under such circumstances included his November 6, 2019, response to Zeton's house.

8.     **CLAUS's** conduct to be influenced under such circumstances included the creation and submission of a police report related to his November 6, 2019, response to Zeton's house.

9.     **CLAUS's** conduct to be influenced under such circumstances included the creation and uploading of body-worn camera footage of his November 6, 2019, response to Zeton's house.

17

**D.    OVERT ACTS:**

In furtherance of the conspiracy and to effect the objects of the conspiracy, the following overt acts, among others, were committed in the Eastern District of Louisiana and elsewhere:

1.    On or about November 1, 2019, **CLAUS** used a computer to access a police report related to an officer's November 1, 2019, response to Zeton's house.

2.    On or about the night of November 3, going into early November 4, 2019, Zeton used a telephone to transmit photographs of paintings to **CLAUS**.

3.    On or about November 6, 2019, **CLAUS** used the internet and email to receive information from Schofield about paintings that Zeton would later report as stolen to **CLAUS**.

4.    On or about November 6, 2019, **CLAUS** used a telephone to transmit information about the paintings to Zeton.

5.    On or about November 6, 2019, Zeton used a telephone to call 911 to report that he needed to supplement his burglary report.

6.    On or about November 6, 2019, **CLAUS** used an NOPD body-worn camera to record his response to Zeton's house.

7.    On or about November 6, 2019, Zeton used a telephone to show **CLAUS** the information about paintings that **CLAUS** had transmitted to Zeton earlier that day.

8.    On or about November 6, 2019, **CLAUS** used the internet to upload and submit to the NOPD the above-referenced body-worn camera recording.

9.    On or about November 6, 2019, **CLAUS** used a computer to create a police report related to his November 6, 2019, response to Zeton's house.

10.    On or about November 6, 2019, **CLAUS** used a computer and a computer network to submit for supervisory approval the above-referenced police report and thereby caused an NOPD Sergeant to use a computer to approve the police report.

11.     On or about December 20, 2019, **CLAUS** used a telephone to send Zeton a text message which included the following: "What i need is a police job for only 6 months where i can show up at 730am or later and leave before 5 pm."

12.     On or about January 22, 2020, **CLAUS** used a telephone to send Zeton a series of text messages which included the following: "I really need your help. My lieutenant told me he could not change my schedule."

13.     On or about December 28, 2020, **CLAUS** used a telephone to send Zeton a series of text messages for the purpose of obtaining Zeton's assistance with **CLAUS's** application for an NOPD detective position.

14.     On or about January 4, 2021, **CLAUS** used a telephone to send Zeton a series of text messages for the purpose of obtaining Zeton's assistance with **CLAUS's** application for a "Domestic Violence Detective" position.

All in violation of Title 18, United States Code, Section 371.

## COUNT 5
### (Use of a Facility in Interstate Commerce in Aid of Bribery)

1.     The allegations contained in Sections A and C of Count 1 and contained in Count 4 are re-alleged and incorporated as if fully set forth herein.

2.     On or about November 6, 2019, in the Eastern District of Louisiana, defendant **CHRISTIAN CONRAD CLAUS** used a facility in interstate commerce, namely the internet, to upload body-worn camera footage, with the intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment and carrying on of an unlawful activity, that is, bribery in violation of Louisiana Revised Statute 14:118, and thereafter performed and attempted to perform an act to promote, manage, establish, and carry on, and to facilitate the promotion, management, establishment and carrying on of such unlawful activity.

All in violation of Title 18, United States Code, Section 1952(a)(3).

19

## COUNT 6
### (False Statement)

1.      On or about June 25, 2021, in the Eastern District of Louisiana, **CHRISTIAN CONRAD CLAUS ("CLAUS")**, did willfully and knowingly make a materially false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of the executive branch of the Government of the United States, by stating in substance to a special agent of the Federal Bureau of Investigation that:

    a. "He couldn't get me photos at that point," in reference to whether Zeton could provide **CLAUS** photographs of the reportedly stolen paintings on November 6, 2019.

    b. "It was a matter of giving the phone number and letting them chat with each other," in reference to **CLAUS**'s role in Schofield's and Zeton's interactions regarding the reportedly stolen paintings.

    c. "He tried to get me to get in between the two of them, and I didn't do it," in reference to whether **CLAUS** acted as an intermediary between Schofield and Zeton.

    d. "I know for a fact that there was never any appraisal that was presented."

    e. "I don't know if Michael did anything that was provided to the insurance," in reference to whether Schofield produced something that was provided to Zeton's insurer.

    f. "Not to my knowledge, no," in response to the question "Did Schofield ever get paid?"

2.      The statements and representations were false because, as **CLAUS** then and there knew:

a. When **CLAUS** responded to Zeton's house on November 6, 2019, Zeton could provide **CLAUS** photographs of the reportedly stolen paintings and had already provided **CLAUS** photographs of the reportedly stolen paintings.

b. **CLAUS's** role in Schofield's and Zeton's interactions regarding the reportedly stolen paintings was substantially greater than giving the phone number and letting Schofield and Zeton chat with each other.

c. **CLAUS** acted as an intermediary between Schofield and Zeton.

d. There was an appraisal presented to Zeton's insurer.

e. **CLAUS** knew Schofield produced something that was provided to Zeton's insurer.

f. **CLAUS** knew Schofield had been paid for the appraisal.

All in violation of Title 18, United States Code, Section 1001(a)(2).

## NOTICE OF FORFEITURE

1. The allegations of Counts 1 through 5 of this Indictment are incorporated by reference as though set forth fully herein for the purpose of alleging forfeiture to the United States.

2. As a result of the offenses alleged in Counts 1 through 5, the defendant, **CHRISTIAN CONRAD CLAUS**, shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461, any property real or personal which constitutes or is derived from proceeds traceable to said offenses.

3. If any of the above-described property, as a result of any act or omission of the defendant:

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third person;

c. has been placed beyond the jurisdiction of the Court;

21

d. has been substantially diminished in value; or

e. has been commingled with other property which cannot be subdivided without difficulty;

the United States shall seek a money judgment and, pursuant to Title 21, United States Code, Section 853(p), forfeiture of any other property of the defendant up to the value of said property.



MICHAEL M. SIMPSON
Attorney for the United States
Acting Under the Authority
Conferred by 28 U.S.C. § 515

CHANDRA MENON
Assistant United States Attorney

New Orleans, Louisiana
June 28, 2024

FORM OBD-34

No. _____

# UNITED STATES DISTRICT COURT

Eastern ____ *District of* ____ Louisiana

____ Criminal ____ *Division*

## THE UNITED STATES OF AMERICA

*vs.*

## CHRISTIAN CONRAD CLAUS

**INDICTMENT FOR CONSPIRACY TO COMMIT MAIL AND WIRE FRAUD, WIRE FRAUD, MAIL FRAUD, CONSPIRACY TO USE A FACILITY IN INTERSTATE COMMERCE IN AID OF BRIBERY, USE OF A FACILITY IN INTERSTATE COMMERCE IN AID OF BRIBERY, AND FALSE STATEMENT**

**VIOLATIONS:** 18 U.S.C. § 371
18 U.S.C. § 1001(a)(2)
18 U.S.C. § 1341
18 U.S.C. § 1343
18 U.S.C. § 1349
18 U.S.C. § 1952(a)(3)

*Filed in open court this* ____ *day of* ____ ____ *A.D. 2024.*

_____
*Clerk*

*Bail, $* _____

**CHANDRA MENON**
**Assistant United States Attorney**